UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| NEW ORLEANS EMPLOYERS INTERNATIONAL LONGSHOREMEN'S ASSOC., AFL-CIO PENSION FUND, AND ITS ADMINISTRATOR, THOMAS R. DANIEL | CIVIL ACTION |
| VERSUS | NO: 17-7430 |
| MARITIME SECURITY, INC. & ADVANCE MARINE SERVICES, INC. | SECTION: "A" (4) |

## ORDER AND REASONS

The following motions are before the Court: **Motion for Summary Judgment (Rec. Doc. 32)** filed by Plaintiffs, New Orleans Employers International Longshoremen's Association, AFL-CIO Pension Fund, and its administrator, Thomas R. Daniel; **Motion for Summary Judgment (Rec. Doc. 33)** filed by defendants, Maritime Security, Inc. and Advance Marine Services, Inc. The motions, submitted for consideration on January 9, 2019, and January 23, 2019, are before the Court on the briefs without oral argument.

This is an action to recover withdrawal liability pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The plaintiff association is a multiemployer pension plan under ERISA, established and maintained for the purpose of providing retirement and related benefits to eligible participants and beneficiaries. Plaintiff, Thomas R. Daniel, is the plan's administrator.

On October 25, 2018, at the parties' request, the Court cancelled the pretrial

conference and trial so that the parties could file cross motions for summary judgment. (Rec. Doc. 27). The parties agree that there are no disputed issues of material fact to preclude summary judgment. For the reasons that follow, Plaintiff's motion is GRANTED, and Defendants' motion is DENIED.

**I.     Background**

The parties have stipulated to the following facts:

Since in or about 1990, defendant Advance Marine Services, Inc. ("AMS") provided stevedoring services to the cruise line industry at the Port of New Orleans. AMS employed longshoremen and cleaning crews, and defendant Maritime Security, Inc. ("MSI") employed the porters or "seacaps" who assisted cruise passengers with boarding and the handling of their luggage.

Defendants MSI and AMS (at times referred to collectively as "Controlled Group") are a "controlled group" pursuant to § 402(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1).

In or about 2003, AMS and MSI employees (except for cleaning crews) elected to be represented by the General Longshore Works Local Union No. 3000 and New Orleans Clerks' and Checkers' Local Union No. 1497 (the "Union"). On or about October 1, 2009, Controlled Group and the Union entered into a collective bargaining agreement effective October 1, 2004, as extended thereafter.[1]

The collective bargaining agreement and associated Trust agreement provide

---

[1] This highlighted statement has been taken directly from the parties' joint factual stipulations so the Court will leave it verbatim even though the Court questions the accuracy of the statement as written. The statement implies that the CBA was first confected in 2009 and made retroactive to five years earlier. The dates are not material to any issue before the Court.

that the New Orleans Employers International Longshoremen's Association, AFL-CIO Pension Fund ("Fund") collects contributions on behalf of the covered Union employees.

Since prior to unionization, AMS and MSI worked exclusively for Carnival Cruise Lines ("Carnival"). Carnival required that AMS and MSI employ Union employees.

In or about December 2015, Carnival terminated its agreement with the Controlled Group, and Controlled Group ceased providing services to Carnival on or about December 7, 2015. Since termination, Defendants have had no source of revenue other than from liquidation of assets.

On or about December 8, 2015, Defendants ceased making fringe benefit contributions to the Fund.

On or about December 12, 2015, Carnival awarded United Stevedoring of America (USA) ("United") the contract to perform stevedoring services for Carnival at the Port of New Orleans. In connection with its contract with Carnival, United entered into a collective bargaining agreement with the Union.

The collective bargaining agreement and associated Trust agreement between United and the Union provides that the Fund is the multiemployer pension plan that provides retirement and related benefits for the Union employees. In connection with its provision of services to Carnival at the Port of New Orleans, United has used substantially the same Union employees that were used by Defendants. United derives all or substantially all of the revenue it contributes to the Fund from services it provides to Carnival at the Port of New Orleans. Provision of stevedoring services to Carnival at the Port of New Orleans continued without interruption upon United being awarded the

contract by Carnival in place of Controlled Group.

The Fund's Consultant, Segal Consulting ("Segal"), calculated withdrawal liability for Defendants based on a completed withdrawal from the New Orleans Employers International Longshoremen's Association, AFL-CIO Pension Plan ("Plan") during the Plan Year ended September 30, 2016. Segal calculated withdrawal liability for MSI to be $1,455,942, payable in 80 quarterly payments of $34,632.

Segal calculated withdrawal liability for AMS to be $1,439,000, payable in 80 quarterly payments of $34,229. Defendants do not contest the methodology utilized by Segal to calculate the withdrawal liability or Segal's calculations with respect to the amount of withdrawal liability assessed.

Defendants made a total of three (3) quarterly payments to the Fund, totaling $206,583.

On July 12, 2017, Annette Brown notified the Fund by way of email that, per her father, Arthur C. Pfalzgraf, Defendants would not be sending any further withdrawal liability payments to the Fund.

The Fund subsequently sent Defendants a notice of default, and filed the present action when the default was not cured. To date, Defendants have made no additional payments toward the assessed withdrawal liability. The outstanding withdrawal liability for Defendants per the Segal calculations is $2,688,359.
(Rec. Doc. 32-9; Rec. Doc. 33-2, Joint Stipulations).

**II.     Discussion**

ERISA was designed "to ensure that employees and their beneficiaries would not

be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in [them]." *Concrete Pipe & Prod. of Calif., Inc. v. Constr. Laborers Pen. Tr. for S. Calif.*, 508 U.S. 602, 607 (1993). The Multiemployer Pension Plan Amendments Act ("MPPAA") was added to ERISA in 1980, and under certain of its provisions, "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined . . . to be the withdrawal liability." 29 U.S.C. § 1381(a); *Concrete Pipe*, 508 U.S. at 607 (quoting *Pens. Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984)). A complete withdrawal from a multiemployer plan occurs when an employer either permanently ceases to have an obligation to contribute under the plan, or permanently ceases all covered operations under the plan. 29 U.S.C. § 1383(a)(1)-(2).

Withdrawal liability is designed to alleviate the problem that individual employer withdrawals have on multiemployer pension plans. *See Gray*, 467 U.S. at 725. To this end, the MPPAA requires employers who withdraw from multiemployer pension plans to pay their "proportionate share of the plan's 'unfunded vested benefits.'" *Concrete Pipe*, 508 U.S. at 607 (quoting 29 U.S.C. §§ 1381, 1391); *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841 7th Cir. 2015). By enacting provisions that hold withdrawing employers liable for their share of their plan's unfunded vested pension benefits, Congress evinced a desire to "relieve the financial burden placed upon remaining contributors to a multiemployer fund when one or more of them withdraws from the plan, avoid creating a severe disincentive to new employers entering the plan, and prevent the creation of

funding deficiencies." *Tsareff*, 794 F.3d at 845-46 (quoting *Upholsterer's Int'l Union Pen. Fund v. Artistic Furn. of Pontiac*, 920 F.2d 1323, 1328 (7th Cir. 1990); H.R. Rep. No. 96-869, at 67).

Under the facts as stipulated to, it is clear that Defendants have effected a complete withdrawal from the Plan. *See* 29 U.S.C. § 1383(a)(1) (defining the factors that constitute a complete withdrawal). Defendants point out, however, that withdrawal liability arises only when the *employer* withdraws from the plan 29 U.S.C. § 1391(a). Defendants argue that Carnival should be deemed the employer in this case, and since Carnival continues to obtain from United the services that Defendants used to provide, it (Carnival as employer) has not withdrawn from the Plan and hence no withdrawal liability has been triggered.

The first difficulty that Defendants face with this line of argument is that they failed to follow the statutorily mandated arbitration procedure for challenging withdrawal liability. 29 U.S.C. § 1401(a)(1) ("Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination [of withdrawal liability] shall be resolved through arbitration."). Although the Fifth Circuit has not addressed the issue, at least one other circuit court has held that an employer's failure to exhaust via arbitration the issue of withdrawal precludes the employer from raising the issue in district court. *Tsareff*, 794 F.3d at 850.

Even if the issue were not waived for failure to exhaust, Carnival not only fails to satisfy the common law test for employer status used in other contexts,[2] but more

---

[2] For instance, in the employment discrimination context, courts look to whether the alleged

importantly it fails to satisfy the even broader concept of an "employer" as used in conjunction with the MPPAA. For purposes of withdrawal liability under the MPPAA, courts have consistently held that the "employer" is the entity that was obligated to contribute to the plan.[3] *See, e.g., Transpersonnel, Inc. v. Roadway Expr., Inc.*, 422 F.3d 456 460 (7th Cir. 2005); *Philippines, Micro. & Orient Nav. Co. v. NYSA-ILA Pen. Trust Fund*, 909 F.2d 39, 41 (2nd Cir. 1990); *Korea Ship. Corp. v. NYSA-ILA Pen. Trust Fund*, 860 F.2d 15311537 (2nd Cir. 1989).

In this case, Carnival had no obligation to contribute to the Plan and it was not a party to the collective bargaining agreement that contractually obligated Defendants to contribute to the Plan. The decisions that Defendants cite (*Korea Shipping* and *Philippines*, *supra*) involved carriers who had actually paid the pension contributions on behalf of the employees. Carnival is not similarly situated to the carriers in those cases. There is no basis to conclude that Carnival should be considered the employer in this case.

Defendants argue that assessing withdrawal liability in this case is unfair because the Plan has suffered no injury given that United essentially stepped into Defendants' shoes vis à vis Carnival. In connection with its contract with Carnival, United entered

---

employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule. *Deal v. State Farm County Mut. Ins. Co.*, 5 F.3d 117, 119 (5th Cir. 1993) (citing *Fields v. Hallsville Indep. Sch. Dist.*, 906 F.2d 1017, 1019 (5th Cir. 1990)). Nothing in the stipulated facts suggests that Carnival would satisfy any of these factors or that Carnival ever paid any type of compensation to Defendants' employees.

[3] Courts considering the issue of "employer" status have noted that Title I of ERISA contains its own definition of "employer" that if applied for purposes of withdrawal liability may support the argument that carriers like Carnival constitute employers. But they have consistently not applied it to the provisions of the MPPAA. *See, e.g., Korea Shipping*, 880 F.2d at 1536.

into a collective bargaining agreement with the Union, and United has used substantially the same Union employees that were used by Defendants. United now contributes to the Fund just the same as Defendants used to do and operations have continued without interruption.

This line of argument is not without appeal when one considers that the purpose of withdrawal liability is to protect multiemployer pension plans from the financial injury that they may face when an individual employer leaves the plan. If the plan would suffer no actual injury from a particular withdrawal, then a hefty penalty like the one being assessed against Defendants seems harsh.

Defendants are in essence arguing that without proof of actual injury, withdrawal liability should not arise. Unfortunately, there is no support in the statutory scheme for excepting withdrawal liability absent proof of actual injury. In fact, the MPPAA does take into account the argument that Defendants are raising because Congress has created express statutory exceptions for certain industries. *See* 29 U.S.C. § 1383 (creating exceptions for the building and construction industry, entertainment industry, trucking industry, household goods moving industry, public warehousing industry); *Resilient Floor Cov. Pen. Trust Fund v. Michael's Floor Cov., Inc.*, 801 F.3d 1079, 1089-90 (9th Cir. 2015) (discussing the contribution base concept). None of those exceptions apply to the industry at issue here, which notwithstanding its prominence in reported decisions, Congress has chosen not to add to the list of exceptions. The Court cannot properly create an exception where none exists.[4]

---

[4] Moreover, the Court notes that while Defendants' assert that the Plan suffered no injury upon

Defendants next argue that if withdrawal liability did arise, then United should be responsible for paying it under the successor liability doctrine.

Courts have recognized that imposing successor liability for unpaid multiemployer pension fund contributions and withdrawal liability effectuates the goals and purposes of the MPPAA. *Tsareff*, 794 F.3d at 846. In the fields of labor and employment law, federal courts have developed a common-law doctrine of successorship liability that "provides an exception from the general rule that a purchaser of assets does not acquire a seller's liabilities." *Resilient Floor*, 801 F.3d at 1090 (quoting *Chi Truck Drivers Helpers & Whse. Workers Union (Indep.) Pen. Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995)). The successorship doctrine, when applicable, holds legally responsible for obligations arising under federal labor and employment statutes businesses that are substantial continuations of entities with such obligations. *Id.* (citing *Artistic Furn.*, 920 F.2d at 1326). Successor liability is an equitable doctrine that requires the court to balance 1) the interests of the defendant, 2) the interests of the plaintiff, and 3) "the goals of federal policy, in light of the particular facts of a case and the particular legal obligation at issue." *Pen. Ben. Guar. Corp. v. Findlay Indus., Inc.*, 902 F.2d 597, 611 (6th Cir. 2018) (citing *Cobb v. Contract Trans., Inc.*, 452 F.3d 543, 554 (6th Cir. 2006)). The primary question is whether the totality of the circumstances demonstrate that there is "substantial continuity" between the old and the new enterprise. *Resilient Floor*, 801 F.3d at 1090 (quoting *Hawaii Carp. Trust Funds v.*

---

their withdrawal—given that United essentially stepped into their shoes vis à vis Carnival—the evidence in the record does not raise an inference that the Plan suffered no injury. In other words, that point is not established on the current record.

*Waiola Carp. Shop, Inc.*, 823 F.2d 289, 294 (9th Cir. 1987)).

The equities do not point in favor of allowing Defendants to saddle United with a debt that they owe.[5] United did not merge with Defendants and it did not purchase Defendants' company. Rather, United was awarded a business contract that Defendants had held for years. The successorship doctrine typically comes into play when the pension fund sues the successor to obtain payment for the predecessor's debt. The Court's research has revealed no decision where a company was allowed to use the doctrine defensively to avoid paying its own debts.

In sum, Plaintiff's motion will be granted as to the issue of withdrawal liability. Defendant's motion will be denied.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 32)** filed by Plaintiffs, New Orleans Employers International Longshoremen's Association, AFL-CIO Pension Fund, and its administrator, Thomas R. Daniel is **GRANTED**. Within **ten (10) days** from entry of this ruling Plaintiff must either move for entry of a final judgment (which Plaintiff shall prepare and provide to the Court with its motion after Defendants have had the opportunity to review the proposed judgment and either consent or object) or file a motion to obtain whatever additional relief Plaintiff is seeking in this matter;

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 33)** filed by defendants, Maritime Security, Inc. and Advance Marine Services, Inc.

---

[5] United is not a party to this lawsuit so even if it were inclined to do so, the Court could not make a determination regarding successor liability that would be legally binding on United.

is **DENIED**.

January 25, 2019

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE